BASCHAB, Judge.
 

 ■On September 25, 1994, the appellant, Eugene Milton Clemons II, was convicted of the capital offense of robbery-murder.
 
 See
 
 § 13A-5^0(a)(2), Ala.Code 1975.
 
 [1]
 
 The jury unanimously recommended that he be sentenced to death. On October 11, 1994, the trial court followed the jury’s recommendation and sentenced the appellant to death. This court and the Alabama Supreme Court affirmed the appellant’s conviction and sentence on direct appeal,
 
 see Clemons v. State,
 
 720 So.2d 961 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998), and the United States Supreme Court denied his petition for certiorari review,
 
 see Clemons v. Alabama,
 
 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999). The relevant facts of the case are set forth in the opinions on direct appeal. This court issued a certificate of judgment on September 10,1998.
 

 
 *318
 
 In December 1999 or January 2000,
 
 [2]
 
 the appellant filed a Rule 32 petition, challenging his conviction and sentence. He filed amended petitions on or about October 17, 2000, and January 31, 2001. The State responded and moved to dismiss many of the claims. The circuit court dismissed some of the claims and denied some of the claims after conducting an evidentiary hearing. This appeal followed.
 

 After the circuit court denied the petition and while the appeal to this court was pending, the United States Supreme Court released its decision in
 
 Atkins v. Virginia,
 
 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In
 
 Atkins,
 
 the Supreme Court held:
 

 “We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our ‘evolving standards of decency,’ we therefore conclude that such punishment is excessive and that the Constitution ‘places a substantive restriction on the State’s power to take the life’ of a mentally retarded offender.”
 

 536 U.S. at 321, 122 S.Ct. at 2252. In
 
 Atkins,
 
 the Supreme Court reversed its earlier decision in
 
 Penry v. Lynaugh,
 
 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).
 

 In his petitions, the appellant argued that his trial attorneys rendered ineffective assistance because they did not develop and present any mitigating evidence concerning his limited mental capacity. In his brief to this court, he reasserts his ineffective-assistance-of-counsel claims. In addition, he argues for the first time that he is mentally retarded and that, in light of
 
 Atkins,
 
 his sentence of death is unauthorized as a matter of law.
 
 [3]
 

 As a threshold matter, we must determine whether the appellant’s claims that he is mentally retarded and that his sentence is unauthorized by law are properly before this court. In
 
 Teague v. Lane,
 
 489 U.S. 288, 310, 109 S.Ct. 1060, 1075, 103 L.Ed.2d 334 (1989), the United States Supreme Court held:
 

 “[W]e now adopt Justice Harlan’s view of retroactivity for cases on collateral review. Unless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.”
 

 The Court then recognized two exceptions to the general rule: (1) those instances in which the new rule places certain kinds of conduct beyond the power of the criminal law-making authority to proscribe and (2) those instances in which the new rule is a “watershed” rule of criminal procedure that requires the observation of procedures that are implicit in the concept of ordered liberty and whose nonapplication would seriously diminish the likelihood of an accurate conviction.
 
 See Teague,
 
 489 U.S. at 307, 311, 313, 109 S.Ct. at 1073, 1076, 1077.
 

 In
 
 Penny,
 
 supra, the United States Supreme Court stated:
 

 “Under
 
 Teague,
 
 we address the retro-activity issue as a threshold matter because Penry is before us on collateral review. 489 U.S., at 310. If we were to
 
 *319
 
 hold that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry, we would be announcing a ‘new rule.’
 
 Id.,
 
 at 301. Such a rule is not dictated by precedent existing at the time Penny’s conviction became final. Moreover, such a rule would ‘brea[k] new ground’ and would impose a new obligation on the States and the Federal Government.
 
 Ibid,
 
 (citing
 
 Ford v. Wainwright,
 
 477 U.S. 399, 410 (1986) which held that the Eighth Amendment prohibits the execution of insane persons, as a case announcing a new rule).
 

 “In
 
 Teague,
 
 we concluded that a new rule will not be applied retroactively to defendants on collateral review unless it falls within one of two exceptions. Under the first exception articulated by Justice Harlan, a new rule will be retroactive if it places ‘ “certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.” ’
 
 Teague, supra,
 
 at 307 (quoting
 
 Mackey[ v. United States],
 
 401 U.S., [667] at 692 [(1971)] (Harlan, J., concurring in judgments in part and dissenting in part)). Although
 
 Teague
 
 read this exception as focusing solely on new rules according constitutional protection to an actor’s primary conduct, Justice Harlan did speak in terms of substantive categorical guarantees accorded by the Constitution, regardless of the procedures followed. This Court subsequently held that the Eighth Amendment, as a substantive matter, prohibits imposing the death penalty on a certain class of defendants because of their status,
 
 Ford v. Wainwright, supra,
 
 at 410 (insanity), or because of the nature of their offense,
 
 Coker v. Georgia,
 
 433 U.S. 584 (1977) (rape) (plurality opinion). In our view, a new rule placing a certain class of individuals beyond the State’s power to punish by death is analogous to a new rule placing certain conduct beyond the State’s power to punish at all. In both cases, the Constitution itself deprives the State of the power to impose a certain penalty, and the finality and comity concerns underlying Justice Harlan’s view of retroactivity have little force. As Justice Harlan wrote: ‘There is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose.’
 
 Mackey, supra,
 
 at 693. Therefore, the first exception set forth in
 
 Teague
 
 should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense.
 
 Thus, if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Pen-ry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonre-troactivity and would be applicable to defendants on collateral revieiv.”
 

 492 U.S. at 329-30, 109 S.Ct. at 2952-53 (emphasis added). Accordingly, we conclude that the decision in
 
 Atkins
 
 falls within
 
 Teague’s
 
 first exception to the general rule of nonretroactivity and applies retroactively to cases that are on collateral review.
 
 [4]
 
 The other states that have ad
 
 *320
 
 dressed this issue since the decision in
 
 Atkins
 
 have also reached this same conclusion.
 
 See Russell v. State,
 
 849 So.2d 95 (Miss.2003);
 
 Johnson v. State,
 
 102 S.W.3d 535 (Mo.2003);
 
 State v. Dunn,
 
 831 So.2d 862 (La.2002).
 

 Our review of the appellant’s arguments that he is mentally retarded, that his trial attorneys rendered ineffective assistance by not developing and presenting any mitigating evidence concerning his limited mental capacity, and that his sentence is unauthorized as a matter of law is hampered because there is conflicting evidence in the record concerning his IQ. The public defender who initially represented the appellant at trial testified that, during his investigation, he had obtained information that indicated that, when the appellant was in the fifth or sixth grade, his IQ had been reported as being 58. (R. 509.)
 
 [5]
 
 Also,
 
 *321
 
 during the federal proceedings against the appellant, Dr. Mark Hazelrigg, a clinical psychologist, testified that testing had shown that the appellant had a full scale IQ of 51, although he questioned the accuracy of that assessment. (C.R. 2834-35.) Further, Dr. Wilburn H. Rivenbark III, a clinical psychologist who had evaluated the appellant before his trial, testified during the evidentiary hearing that, “[B]ased on some of the screening that I did I estimated that his intelligence probably was in the range of mild retarded, borderline, somewhere in that range.” (R. 130.)
 
 [6]
 
 However, there were other indications that the appellant had an IQ that was greater than 70.
 

 Our review of the appellant’s arguments is further hampered because the circuit court excluded the testimony of Dr. Charles Golden, a clinical neuropsychologist, who was prepared to testify during the evidentiary hearing about the appellant’s low IQ, his mental retardation, his intellectual and emotional deficits, and the existence of brain damage. On the day Dr. Golden was scheduled to testify, the State filed a motion in limine seeking to exclude his testimony. After conducting a hearing on the motion, the circuit court excluded Dr. Golden’s testimony on the ground that a neuropsychologist could not testify concerning the cause of brain damage. (C.R. 1146.) However, the appellant asserts that Dr. Golden was not going to testify about the cause of his brain damage. Rather, he contends that Dr. Golden could have testified that he had had brain damage since the first grade, when a neu-ropsychological test revealed his mental problems, and that he had brain damage. Such testimony is admissible if the expert is trained in that particular area of expertise.
 
 See Kriewitz v. Savoy Heating & Air Conditioning Co.,
 
 396 So.2d 49, 52 (Ala.1981). Further, the appellant made an extensive offer of proof concerning what Dr. Golden’s testimony would have been. Specifically, Dr. Golden would have testified that the appellant had had brain damage since the first grade and that his IQ scores showed his low mental functioning; that, due to his poor performance, it had been recommended that the appellant be placed in classes for mentally retarded students; and that previous IQ tests had indicated that the appellant had a verbal IQ of 58 and a performance IQ of 50 because of a lack of cooperation. For the reasons set forth herein, and in light of the appellant’s arguments concerning mental retardation and trial counsel’s performance, we conclude that the circuit court erroneously excluded Dr. Golden’s testimony.
 

 Therefore, the record before us is not sufficient to allow this court to conclude, as did the Alabama Supreme Court in
 
 Ex parte Perkins,
 
 851 So.2d 453 (Ala.2002), that the appellant is not mentally retarded. Before we can proceed further in evaluating the merits of the appellant’s arguments, the circuit court must determine whether or not the appellant is mentally retarded. On remand, the circuit court shall address this question only after allowing both parties to submit evidence in support of their respective positions and in compliance with this opinion. In determining whether or not the appellant is mentally retarded, the circuit court should consider the standard set forth in
 
 Ex parte
 
 
 *322
 

 Smith,
 
 [Ms. 1010267, March 14, 2003] — So.2d —(Ala.2003);
 
 Ex parte Perkins,
 
 851 So.2d 453 (Ala.2002); and
 
 Stallworth v. State,
 
 868 So.2d 1128 (Ala.Crim.App.2001) (opinion on return to second remand).
 
 [7]
 

 Accordingly, we remand this case to the circuit court with instructions that that court conduct an evidentiary hearing on and make specific, written findings of fact as to the appellant’s contentions that he is mentally retarded, that his trial attorneys rendered ineffective assistance by not developing and presenting evidence concerning his limited mental capacity, and that his sentence is unauthorized as a matter of law.
 
 [8]
 
 On remand, the circuit court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 98 days after the release of this opinion. The return to remand shall include the circuit court’s specific, written findings of fact and a transcript of the evidentiary hearing.
 

 REMANDED WITH INSTRUCTIONS.
 

 McMILLAN, PM., and COBB, SHAW, and WISE, JJ., concur.
 

 On Return to Remand
 

 BASCHAB, Judge.
 

 On August 29, 2003, we remanded this case to the circuit court with instructions that that court determine whether the appellant, Eugene Milton Clemons II, is mentally retarded; whether his trial attorneys rendered ineffective assistance by not developing and presenting evidence concerning his limited mental capacity; and whether his sentence is unauthorized as a matter of law. On remand, the circuit court conducted an evidentiary hearing and entered an extensive order in compliance with our instructions. Afterward, the appellant submitted a brief in which he raised arguments concerning the remand proceedings. We now address the remaining arguments he raised in his brief on original submission and the arguments he raises in his brief on return to remand.
 

 In reviewing the circuit court’s rulings on the appellant’s arguments, we apply the following principles:
 

 “ ‘ “[T]he plain error rule does not apply to Rule 32 proceedings, even if the case
 
 *323
 
 involves the death sentence.”
 
 Thompson v. State,
 
 615 So.2d 129 (Ala.Cr.App.1992).’
 
 Cade v. State,
 
 629 So.2d 38, 41 (Ala.Crim.App.1993), cert. denied, [511] U.S. [1046], 114 S.Ct. 1579, 128 L.Ed.2d 221 (1994).
 

 “In addition, ‘[t]he procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed.’
 
 State v. Tarver,
 
 629 So.2d 14, 19 (Ala.Crim.App.1993).”
 

 Brownlee v. State,
 
 666 So.2d 91, 93 (Ala. Crim.App.1995).
 

 I.
 

 The appellant argues that he is mentally retarded and that, therefore, his sentence of death is unauthorized as a matter of law. In
 
 Atkins v. Virginia,
 
 536 U.S. 304, 321, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002), the Supreme Court held:
 

 “We are not persuaded that the execution of mentally retarded criminals will measurably advance the deterrent or the retributive purpose of the death penalty. Construing and applying the Eighth Amendment in the light of our ‘evolving standards of decency,’ we therefore conclude that such punishment is excessive and that the Constitution ‘places a substantive restriction on the State’s power to take the life’ of a mentally retarded offender.”
 

 Subsequently, in
 
 Ex parte Perkins,
 
 851 So.2d 453, 456 (Ala.2002), the Alabama Supreme Court stated:
 

 “[T]his Court can determine, based on the facts presented at Pei'kins’s trial, that Perkins, even under the broadest definition of mental retardation, is not mentally retarded. Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).”
 

 See also Ex parte Smith,
 
 [Ms. 1010267, March 14, 2003] — So.2d — (Ala.2003).
 

 The parties presented extensive and often conflicting evidence regarding whether the appellant is mentally retarded. In its order denying the petition, the circuit court made the following findings:
 

 “[I]t is clear that Clemons does not meet either the intelligence or adaptive functioning elements to establish mental retardation.
 

 “The Court first addresses the intelligence component in determining whether Clemons is mentally retarded.
 

 “Clemons has been administered intelligence testing on numerous occasions, and his scores are remarkable in their divergence, ranging from a low of 51 to a high of 84. The scores are most likely divergent because Clemons frequently malingers when he is tested, a conclusion that was drawn by many of the mental health professionals who have examined Clemons. Because Clemons has taken so many intelligence tests, the Court will list them in chronological fashion.
 

 “Clemons was first administered an intelligence test, the Stanford-Binet Intelligence Test, when he was six and a half years old. EH at 53. Clemons scored a 77 on the test which placed him in the borderline range of intelligence. Despite this fact, his school records indicate that he was labeled ‘educable mentally retarded’ soon after taking this test. Clemons’ school records which tend to indicate minimal academic
 
 *324
 
 achievement were consistent with his relatively low score on the Stanford-Binet Intelligence Test. They show that by the end of the elementary school, Clemons was two years behind and that he completed the tenth grade and did not receive a high school diploma. Petitioner’s Exhibits 2-5. The records do not show that Clemons was administered any additional intelligence tests throughout his school career.
 

 “Clemons, while in prison at age 19, was administered a BETA-II intelligence test on which he scored a full-scale IQ of 84. R32 Vol. 7 at 1317,1326. This test result was the highest score that Clemons ever achieved. In the fall of 1992, after being charged in both state and federal court with murdering a federal law enforcement official, Clemons began the first of three rounds of testing by various mental health professionals.
 

 “During a court-ordered forensic evaluation at a federal prison in Butner, North Carolina, Clemons was administered various psychological tests including an intelligence test. Clemons was administered the Wechsler Adult Intelligence Scale-Revised (WAIS-R) and scored a full-scale IQ of 51. R32 Vol. 7 at 1323. The psychologist who administered this test was dubious that he had obtained a valid result. He stated that people in the low-50s IQ range are ‘often in need of structured living and may be institutionalized’ and are typically unable to care for their basic needs.
 
 Id.
 
 The Butner report further states that ‘[i]t would be virtually impossible for a person with an IQ of 51 (from the present testing) to earn a score of 84 on the BETA-II only one year previous.’
 
 Id.
 
 The psychologist who conducted the testing noted that when he tried to obtain a writing sample Clemons wrote with his left hand even though he is right handed, another indicator that Clemons was not giving his best effort. R32 Vol. 7 at 1324. The psychologist ultimately concluded that Clemons was in the borderline range of intellectual functioning and that the results of the testing were invalid because Clemons was malingering. R32 Vol. 7 at 1325.[
 
 1
 
 ]
 

 
 *325
 
 “Before his trial in federal court, Clemons’ attorneys had Clemons evaluated by Dr. William Grant, a psychiatrist. R32 Vol. 7 at 1289-1301. Although Dr. Grant did not conduct any intelligence tests or psychological tests, he agreed with the psychologist at But-ner Correctional Facility that Clemons was malingering. Dr. Grant’s report indicated that Clemons entered the interview room ‘laughing hysterically and incessantly.’ R32 Vol. 7 at 1290. His report indicated that Clemons stopped laughing vdien he was informed that ‘faking’ would not be in his best interest.
 
 Id.
 
 Dr. Grant’s overall conclusions were that Clemons was malingering and that he was antisocial. R32 Vol. 7 at 1299. Dr. Rivenbark, at Taylor Hardin Secure Medical Facility, evaluated Clemons in 1992 and 1994 and also concluded that Clemons was malingering. R32 Vol. 7 at 1281, R32 Vol. 29 at 5646. Dr. Riven-bark apparently did not perform any testing on Clemons.[
 
 2
 
 ]
 

 “The second round of testing occurred before Clemons’ first Rule 32 evidentia-ry hearing held in 2001. Dr. Kimberly Ackerson, a psychologist practicing in Birmingham, was hired by Clemons’ present counsel to perform a psychological evaluation of Clemons. As a part of this evaluation, she administered various tests including the Wechsler Adult Intelligence Scale-Revised (WAIS-R). Clemons obtained a full-scale IQ of 73 on this intelligence test. On the score sheet, Dr. Ackerson noted that Clemons appeared motivated and that he was deliberate in making his responses. Dr. Ackerson stated that Clemons’ score placed him in the ‘borderline’ classification. Dr. Ackerson testified at the Rule 32 evidentiary hearing conducted in 2001 but was not called as a witness at the most recent Rule 32 evidentiary hearing conducted in June 2004.
 

 “Dr. Glen King, a board-certified clinical psychologist, was hired by the Attorney General’s Office to perform a psychological evaluation of Clemons before the first Rule 32 evidentiary hearing. Dr. King was not called as a witness at the first Rule 32 evidentiary hearing but was called at the recent Rule 32 eviden-tiary hearing and testified, among other things, about the testing he performed in 2001. In February 2001, Dr. King administered the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III)
 
 *326
 
 to Clemons and obtained a full-scale IQ score of 77. EH at 771. Dr. King stated that Clemons had a nine-point difference between the verbal and performance IQ score which was ‘a little larger than we would like to see’' but stated that the difference could be attributed to Clemons’ low score on the ‘digit symbol coding’ test where it did not appear that Clemons was ‘... trying hard.’ EH at 773. Dr. King stated that Clemons’ full scale IQ score ‘indicates functioning in the general area that we call borderline intellectual ability, which is between mentally retarded functioning and the average.’ EH at 771. During this same round of testing, Dr. King stated that he administered the spelling and reading portion of the ‘Wide Range Achievement Test — Third Edition’ which is a measure of academic achievement. EH at 778-79. Clemons scored a 98 on the reading part and a 96 on the spelling part which equates to Clemons being able to read and spell at the ‘high school level.’ EH at 779.
 

 “The third round of testing occurred after the Court of Criminal Appeals remanded the case for this Court to determine, among other things, whether Clemons is mentally retarded. In February 2004, Dr. King administered the Halsted-Reitan test battery which includes the original version of the Wech-sler, the Wechsler Adult Intelligence Scale (WAIS). Dr. King testified that he noticed Clemons was much more indifferent in his attitude during the more recent testing. EH at 784. During the testing, Clemons did not appear to be motivated to give his best effort and even claimed that the ‘right side’ of his body was going numb to the point that he was paralyzed. EH at 784-85. Dr. King stated that he had not seen anything in Clemons’ medical history that indicated Clemons suffers from temporary paralysis in his right side. EH at 786. On the WAIS, Clemons obtained a full-scale IQ score of 67. Because the WAIS is considered an easier test than the WAIS-III, Dr. King subtracted seven points from the results of the WAIS so that those scores would equate with the results of the WAIS-III. EH at 792-93. Therefore, Clemons’ full-scale IQ score on the WAIS is 60 as compared with the full-scale IQ of 77 that Clemons received three years previous on the WAIS-III.[
 
 3
 
 ] Dr. King stated that
 
 *327
 
 without some intervening event such as a stroke, physical problem, or serious disease it is difficult to account for a 17-point drop in a full-scale IQ score. EH at 793. Dr. King concluded that Clemons was malingering in an effort to score lower on the WAIS that was given in 2004.[
 
 4
 
 ] Dr. King’s overall assessment is that Clemons functions in the ‘borderline range of intellectual ability.’ EH at 819.
 

 “Dr. Golden, the psychologist hired by Clemons’ present counsel to perform a psychological evaluation, administered the Stanford-Binet Intelligence Scale-Fourth Edition to Clemons on October 23, 2003. EH at 133. Dr. Golden testified that he gave this particular intelligence test because it is a better measure of intelligence for a person who is mentally retarded. EH at 133-37. Dr. Golden did not support this conclusion, however, with literature from any journals. Clemons achieved a full-scale IQ score of 58 on the Stanford-Binet administered by Dr. Golden. EH at 139. However, Dr. Golden stated that because the Stanford-Binet uses a ‘slightly different scoring system’ from the Wechsler test, Clemons’ scores should be adjusted upward by three, thus giving Clemons a full-scale IQ score of 61. EH at 139. Dr. Golden then stated that this score was ‘probably an overcorrection.’
 
 Id.
 
 Dr. Golden then performed another calculation:
 

 “‘Probably a better estimate of the Binet IQ is to average these four scores together [verbal reasoning-62; abstract visual reasoning-62; quantitative reasoning-59; short term memory-68], which actually gives you a score of sixty-six overall as his IQ. And this is the more comparable score to what we are working on with he WAIS.’
 

 “EH at 139 and 140. Dr. Golden gave no justification on why these additional calculations were necessary to derive Clemons’ full-scale IQ score.
 

 “Dr. King testified that he was not aware of any information that requires a psychologist to scale an IQ score that is attained on the Stanford-Binet test. EH at 823-24. In fact, Dr. King stated that ‘[t]he Stanford-Binet Intelligence Scale as Revised uses norms like other tests, and you come up with an IQ score based on those norms and that’s the IQ score.’ EH at 824. During the eviden-tiary hearing, Clemons presented no evidence to support Dr. Golden’s assertion that it is necessary to scale scores upward that are obtained from the administration of the Stanford-Binet Intelligence Test.
 

 “As can be seen above, Clemons’ IQ scores vary widely from a low of 51 on the WAIS-R given at the Butner Correctional Facility in fall 1992 to a high of 84 on the BETA-II, apparently administered by the Alabama Department of Corrections sometime in 1991. The evidence demonstrates that when Clemons puts forward effort, he consistently
 
 *328
 
 scores in the 70-80 range on intelligence tests. These scores place him in the borderline range of intellectual functioning and establish that he is not mentally retarded. The testing revealed that Clemons scored below 70 three times, twice as a part of the latest round of testing when Clemons was presumably aware of the Court of Criminal Appeals’ remand on the mental retardation issue. In the fall of 1992, Clemons scored a 51 on the WAIS-R, a score which was discounted by the test administrator because it was inconsistent with the 84 score that Clemons achieved on the BETA-II the previous year. R32 Vol. 7 1323. The psychologist at Butner stated that a person scoring a 51 on an intelligence test would possibly have to be institutionalized and not be able to take care of basic needs.
 
 Id.
 
 Despite Clemons’ score of 51, the psychologist at But-ner found that Clemons was functioning in the borderline range. R32 Vol. 7 at 1325.
 

 “During the most recent round of testing, Clemons scored below 70 on tests administered by Dr. Golden and Dr. King. Clemons obtained a 58 on the Stanford-Binet administered by Dr. Golden who offered cryptic explanations in an effort to demonstrate that a 58 really meant that Clemons scored a 66. Dr. King stated that he was unaware of any reason why the final score on a Stanford-Binet becomes another score. Clemons was offered the chance to present rebuttal evidence and never refuted Dr. King’s statement. The Court finds that Clemons received a 58 full-scale IQ on the test administered by Dr. Golden and that Dr. Golden offered incredible reasons in an effort to make the score appear more consistent with Clemons’ other scores. Dr. King, during the most recent round of testing, administered the original version of the Wechsler as a part of a neuropsychological test battery and obtained a full-scale IQ score of 67. Dr. King then scaled the score to a 60 to make the score equivalent to a score derived on the WAIS-III because the WAIS is an easier test than the WAIS-III. EH at 792. Again, despite being given the opportunity to present rebuttal evidence, Clemons never refuted Dr. King’s statement that the WAIS should be scaled down if the score is to be given a WAIS-III equivalent score[
 
 5
 
 ]
 

 “Therefore, the Court finds that Clemons does not satisfy the criteria to establish mental retardation under the
 
 *329
 
 intellectual functioning element. The evidence demonstrates that when Clemons puts forward some effort he consistently scores in the 70-80 range on intelligence tests. Further, the evidence demonstrates that when Clemons malingers he consistently scores in the 50-60 range. Clemons has failed to establish that he meets the criteria to establish ‘significantly subaverage general intellectual functioning.’ Because Clemons has not established this criteria, he is not mentally retarded.
 

 “Notwithstanding the above finding that [the] Petitioner is not mentally retarded, the Court also addresses the adaptive functioning element of mental retardation.
 

 “As previously stated, the state appellate courts have looked to various factors in examining whether a criminal is mentally retarded and therefore exempt from the death penalty.
 
 Perkins,
 
 851 So.2d at 456;
 
 Smith,
 
 [Ms. 1010267, March 14, 2008] — So.3d at —;
 
 Stallworth [v. State],
 
 868 So.2d [1128] at 1182 [(Ala.Crim.App.2001) ]. Among these factors are: employment history, the ability to have interpersonal relationships, being extensively involved in criminal activity, post-crime craftiness on the part of the criminal, and being able to use community resources. The record demonstrates that all of the above-mentioned factors apply to Clemons and establish that he is not mentally retarded.
 

 “Even though Clemons went to jail when he was 19 years old and therefore did not have much of an opportunity to hold many jobs, the record demonstrates that he was still able to hold a few jobs. The Butner report indicates that ‘[Clemons] has held a variety of unskilled positions, none lasting more than a few months.’ R32 Vol. 7 at 1317. Clemons’ most notable job was as a delivery driver for Domino’s pizza. Daryl Pritchett, the manager who employed Clemons, testified at the first Rule 32 hearing that this job requires an individual to have a valid driver’s license. R32 Vol. 36 at 304-05. Clemons’ grandfather had purchased a car for Clemons so that he could work at Domino’s. R32 Vol. 36 at 300. Although Pritchett said that Clemons returned more pizzas than other delivery drivers, he recalled that' if Clemons was familiar with the neighborhood he would not have trouble delivering the pizza. R32 Vol. 36 at 307. Pritchett said that a delivery driver was expected to be able to make change out of the ‘bank’ that was provided to them at the beginning of the shift without the benefit of a calculator. R32 Vol. 36 at 309. Pritchett admitted that sometimes Clemons would ‘come up short’ when all of his receipts were reconciled at the end of the evening.
 
 Id.
 
 Clemons’ work performance was satisfactory, however, but he just stopped coming to work after a month or two. R32 Vol. 36 at 306.
 

 “The lack of an employment history is perhaps better explained by Clemons’ lack of desire rather than inferior adaptive functioning. As the psychologist at Butner Correctional Facility stated:
 

 “ ‘In addition to outright illegal behavior, Mr. Clemons has never chosen to support himself or be responsible for his own needs. He has lived with relatives, even as an adult, has not maintained employment, and has spent his time engaged in illegal behavior, substance abuse, and promiscuous sexual activity.’
 

 “R32 Vol. 7 at 1325. If Clemons has a lack of employment history, this Court finds the records introduced during the Rule 32 proceedings establish it is due to a lack of motivation on his part to find work.
 

 
 *330
 
 “Clemons had the ability to form interpersonal relationships with women, a factor the appellate courts have ruled has relevance in examining whether a criminal defendant is mentally retarded. Smith.... The Butner report indicates that Clemons had a number of relationships with women. Clemons stated that he had numerous relationships with women and one serious relationship. R82 Vol. 7 at 1317. Clemons stated that he fathered at least two children but because he had been with so many women, he did not. remember the names of the women who bore his children.
 
 Id.
 

 “Clemons’ post-crime conduct supports the notion that he was a crafty criminal intent on minimizing his culpability and establishing a defense to his crime, another factor indicating Clemons does not have substantial deficits in adaptive functioning. After being placed under arrest, Clemons gave a statement to the FBI. Supp.R.-Exhibits Vol. 4 at p. 1 (unnumbered pages). In the statement, Clemons in a clever way minimized his criminal culpability and even attempted to establish that he was defending himself when he killed Agent Althouse. Clemons stated that on the day of the crime, he was picked up by Kenny Reid and Dedrick Smith who both had guns and were talking about taking cars at gunpoint.
 
 Id.
 
 As they were riding around looking for cars, Clemons told them, ‘if you’re going to take cars, take me home.’
 
 Id.
 
 They saw a black Camaro at a convenience store and Reid and Smith told Clemons to take the car.
 
 Id.
 
 at p. 2. When Clemons hesitated, they taunted him.
 
 Id.
 
 As Clemons exited the car, they threw a gun for him to use.
 
 Id.
 
 As Clemons approached the car, he.noticed a white male in the passenger seat talking on a cell phone.
 
 Id.
 
 When Clemons pointed the gun at Agent Althouse and said he was taking the car, Althouse dropped the phone and stated, ‘[0]kay, sure.’
 
 Id.
 
 Clemons stated that Agent Althouse then smirked and pulled a gun from his ‘rear area’ and appeared as if he was going to shoot Clemons.
 
 Id.
 
 After Clemons observed Agent Althouse draw the gun, Clemons ‘poured’ his gun, meaning that he fired a number of rounds.
 
 Id.
 
 This statement reflects Clemons’ criminal sophistication in that he attempted to make himself look like a follower and, at the same time, contend he killed only in self defense.
 

 “Other facts presented at Clemons’ trial demonstrate that Clemons’ statement contained numerous false statements. A week before the murder, Herman Shannon testified that Clemons came to his house and asked if anyone had a gun. R. 1423. Shannon gave Clemons a gun and testified that it was the same gun Clemons was in possession of immediately after the crime occurred. R. 1423. Shannon’s testimony indicates that Clemons acted with premeditation by obtaining a gun a week before he carried out the carjacking. Kenny Reid testified that on the night of the crime they were traveling down Highway 280 when Clemons told Smith to pull into the Chevron gas station. R. 1327-28. Clemons, referring to a car parked at the gas station, yelled ‘that’s it, right there.’ R. 1329. Smith let Clemons out and parked at the Wendy’s next door to the gas station. R. 1330. Soon thereafter, Reid heard two gunshots and then several more rounds of shots and saw Clemons drive through a red light at a high rate of speed. R. 1331-32. Reid said that when he saw Clemons later that night, Clemons instructed him not to talk because he had killed a DEA man. R. 1335. Leon Johnson, who was at the house where Clemons drove im
 
 *331
 
 mediately after the murder, stated that Clemons said he would kill him if he talked to the police. R. 1449. These facts demonstrate that Clemons was not an unwitting follower due to his low intelligence but rather that he had a deliberate plan to carjack a car.
 

 “Another factor relative to adaptive functioning is being extensively involved in criminal activity. Smith.... There was evidence presented at trial that indicated Clemons carjacked cars on three separate occasions at gunpoint. R. 1478-80, 1493-99, 1503-08. In all of these crimes, Clemons committed the forcible taking of the car without any assistance. Clemons’ ability to repeatedly engage in illegal behavior refutes the notion that he had significant limitations in adaptive behavior.
 

 “Finally, the state courts have indicated that being able to use community resources is relevant in determining adaptive functioning. In
 
 Stallworth,
 
 868 So.2d at 1182, the Court of Criminal Appeals indicated that a person qualifying for food stamps is evidence of adequate adaptive skills. After Clemons killed Agent Althouse, he soon fled the Birmingham area and left for Cleveland, where he had family. Clemons was transported to Cleveland on a Greyhound Bus, which is an indication that Clemons could use the community resource of public transportation.
 

 “All of the above various factors refute Clemons’ contention that he has significant limitations in adaptive behavior. Two of the psychologists that have examined Clemons have stated that he does not have significant limitations in adaptive functioning. Dr. King stated the following:
 

 “ ‘In addition, by history, Mr. Clemons had a driver’s license, he worked some places for a year at a time. He was able to matriculate through school to the tenth grade, even if he stopped at that point. He has literacy levels that seem to vary by whoever is giving him the test and under what circumstances, but clearly with me he was able to recognize words and spell words, rather sophisticated words, at about a high school level with ninety-eight, ninety-six scores.’
 

 “EH at 836. Dr. Grant, who was hired by Clemons’ attorneys to perform an evaluation before the federal trial, found that Clemons was a hardened criminal who demonstrated adaptive skills in prison that refuted any notion that he was mentally retarded:
 

 “ ‘Data from Jefferson County Jail personnel indicate that Mr. Clemons is currently housed on a violent floor with twenty-two other violent criminals. Individuals with low IQs in this setting tend to be victimized by other inmates, who steal food off their trays, their money, and their candy (the Defendant arrived at the interview carrying candy). Defendants in this setting who are mentally slow, typically get into fights or have to be put in protective custody on the medical unit. Mr. Clemons’ survival on a violent unit may attest to his true ability to function.’
 

 “R32 Vol. 7 at 1298-99. Clemons has not demonstrated that he has significant limitations in adaptive functioning.
 

 “The third element to prove mental retardation is that significantly subaver-age intellectual functioning and significant deficits in adaptive behavior must occur before the age of 18.
 
 Ex parte Perkins,
 
 851 So.2d at 456;
 
 Ex parte
 
 Smith.... Clemons was first administered an intelligence test when he was six and a half years old, scoring a 77 on the test which placed him in the border
 
 *332
 
 line range of intelligence. Clemons was apparently not administered any more intelligence tests until he was past age 18. The Alabama Supreme Court has ruled that scores above 70 place a defendant above the cut-off to establish significantly subaverage intellectual functioning.
 
 Ex parte Perkins,
 
 851 So.2d at 456;
 
 Ex parte
 
 Smith.... Clemons likewise did not produce any evidence of significant deficits of adaptive functioning before age 18.
 

 “For the foregoing reasons, this Court finds that Clemons is not mentally retarded.”
 

 (Remand C.R. 9-29) (footnotes omitted).
 

 We have reviewed the record in light of
 
 Perkins
 
 and
 
 Smith,
 
 and we conclude that it supports the circuit court’s findings. Therefore, we adopt those findings as part of this opinion. Based on the record before us, we conclude that, even under the broadest definition of mental retardation, the appellant is not mentally retarded and that imposition of the death penalty in his case would not be unconstitutional.
 
 [6]
 

 II.
 

 The appellant also argues that his trial attorneys rendered ineffective assistance in several instances. However, he was represented by different counsel at trial and on direct appeal; appellate counsel filed a motion pursuant to
 
 Ex parte Jackson,
 
 598 So.2d 895 (Ala.1992), overruled by
 
 Ex parte Ingram,
 
 675 So.2d 863 (Ala.1996), to extend the time for filing a motion for a new trial until after the transcript of the trial was completed; and appellate counsel subsequently filed a motion for a new trial in which he argued that trial counsel had rendered ineffective assistance.
 

 We addressed a similar situation in
 
 Brooks v. State,
 
 929 So.2d 491, 496 (Ala.Crim.App.2005), as follows:
 

 “In 1993, when Brooks was tried, the procedure established by the Alabama Supreme Court in
 
 Ex parte Jackson,
 
 598 So.2d 895 (Ala.1992), was in effect. In order to raise a claim of ineffective assistance of trial counsel on direct appeal appellate counsel could move to extend the time for filing a motion for a new trial. Claims of ineffective assistance could then be presented in the motion for a new trial and reviewed on direct appeal. In 1996, the Alabama Supreme Court reversed its earlier holding in
 
 Jackson,
 
 citing as its reason the numerous procedural problems that the decision had created.
 
 Ex parte Ingram,
 
 675 So.2d 863 (Ala.1996). The court specifically held that
 
 Ingram
 
 was not to be applied retroactively. 675 So.2d at 865.
 

 “At trial Brooks was represented by attorneys Kenneth John Gomany and J. Scott Boudreaux. Attorney Virginia Vinson was appointed to represent Brooks on appeal. Trial counsel filed a motion for a new trial, and appellate counsel was granted leave to amend the motion under the
 
 Jackson
 
 procedure. Appellate counsel raised 11 claims of ineffective assistance of trial counsel in the amended motion for a new trial. A hearing was held on the motion, and the circuit court denied relief. Several of the claims were raised and addressed on direct appeal. As we stated in
 
 Payne v. State,
 
 791 So.2d 383, 390 (Ala.Crim.App.
 
 *333
 
 1999), cert. denied, 791 So.2d 408 (Ala.2000):
 

 “ ‘Because Payne was represented by different counsel at trial and on appeal, any claim of ineffective assistance of trial counsel should have been raised in a motion for a new trial in order to preserve the issue for review.
 
 Ex parte Jackson[,
 
 598 So.2d 895 (Ala.1992) ]. Thus, the trial court correctly concluded that Payne’s claims regarding ineffective assistance of trial counsel are procedurally barred by Rule 32.2(a)(3) and (a)(5)[, Ala. R.Crim. P.,] as claims that could have been, but were not, raised at trial or on appeal. See
 
 Bryant v. State,
 
 739 So.2d 1138 (Ala.Cr.App.1998);
 
 Dyson v. State,
 
 722 So.2d 782 (Ala.Cr.App.1997);
 
 Hartzog v. State,
 
 733 So.2d 461 (Ala.Cr.App.1997);
 
 Andersch v. State,
 
 716 So.2d 242 (Ala.Cr.App.1997);
 
 Arrington v. State,
 
 716 So.2d 237 (Ala.Cr.App.1997);
 
 Alexander v. State,
 
 679 So.2d 227 (Ala.1996);
 
 Covington v. State,
 
 671 So.2d 109 (Ala.Cr.App.1995);
 
 Alderman v. State,
 
 647 So.2d 28 (Ala.Cr.App.1994)
 
 Ex parte Jackson,
 
 supra. Cf.
 
 Mason v. State,
 
 768 So.2d 981 (Ala.Cr.App.1998)(applying
 
 Ex parte Jackson
 
 in a capital case);
 
 Bush v. State,
 
 695 So.2d 70, 128 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); and
 
 Brown v. State,
 
 712 So.2d 1112 (Ala.Cr.App.1997).’
 

 “See also
 
 Baker v. State,
 
 683 So.2d 1 (Ala.Crim.App.1995);
 
 Page v. State,
 
 622 So.2d 441 (Ala.Crim.App.1993). Therefore, any claims related to the performance of trial counsel are procedurally barred in this postconviction proceeding.
 

 See Rule 32.2(a)(3) and (a)(5), Ala. R.Crim. P.”
 

 Because the appellant was represented by different counsel at trial and on appeal and because the
 
 Jackson
 
 procedure was in effect at the time of the appellant’s conviction, any ineffective-assistance-of-trial-counsel claims should have been raised in a motion for a new trial and on direct appeal. In fact, he did raise ineffective-assistance-of-trial-counsel claims in his motion for a new trial and on direct appeal. Therefore, the appellant’s ineffective-assistance-of-trial-counsel claims are precluded pursuant to the provisions of Rule 32.2(a), Ala. R.Crim. P.
 

 III.
 

 The appellant argues that the circuit court erred in not granting his motion to correct an alleged clerical error related to the date his petition was deemed filed. The record shows that, on December 27, 1999, the appellant submitted a Rule 32 petition to the circuit clerk’s office. However, he did not submit a filing fee or a request to proceed
 
 informa pauperis
 
 with the petition. On January 28, 2000, the appellant submitted both a Rule 32 petition and a request to proceed
 
 in forma pauperis
 
 to the circuit clerk’s office, and the circuit clerk docketed the Rule 32 petition as filed on that date.
 

 Subsequently, the appellant requested that the case action summary sheet be corrected to show an original filing date of December 27, 1999.
 
 [7]
 
 After conducting a hearing on this matter, the circuit court made the following entry on the case action summary sheet: “Petitioner’s Motion to Correct Clerical Error: Denied, as the Court finds the Defendant’s Rule 32 petition was properly filed on January 28, 2000.” (C.R.4.)
 

 
 *334
 
 Rule 32.6(a), Ala. R.Crim. P., provides, in pertinent part:
 

 “[A Rule 32 petition] shall also be accompanied by the filing fee prescribed by law or rule in civil cases in the circuit court unless the petitioner applies for and is given leave to prosecute the petition in forma pauperis....
 

 “Upon receipt of the petition and the filing fee, or an order granting leave to the petitioner to proceed in forma pau-peris, the clerk shall file the petition.
 
 ...”
 

 (Emphasis added.) Section 12-19-70, Ala. Code 1975, which governs civil filing fees, or docket fees, provides:
 

 “(a) There shall be a consolidated civil filing fee, known as a docket fee, collected from a plaintiff at the time a complaint is filed in circuit court or in district court.
 

 “(b) The docket fee may be waived initially and taxed as costs at the conclusion of the case if the court finds that payment of the fee will constitute a substantial hardship. A verified statement of substantial hardship, signed by the plaintiff and approved by the court, shall be filed with the clerk of court.”
 

 Section 12-19-70, Ala.Code 1975, applies to Rule 32 petitions.
 
 [8]
 

 See Ex parte McWilliams,
 
 812 So.2d 318, 320 (Ala.2001) (noting that “[s]ection 12-19-70, Ala.Code 1975, requires that a circuit court collect the docket fee for a postconviction petition at the time the petition is filed, unless the circuit court approves a verified statement of substantial hardship, in which event the docket fee may be initially waived and then taxed as costs at the conclusion of the case”);
 
 Ex parte Carter,
 
 807 So.2d 534, 536 (Ala.2001) (noting that “the circuit court never had jurisdiction to consider Carter’s Rule 32 petition, because it did not collect a filing fee or approve Carter’s affidavit of substantial hardship at the time the petition was filed”).
 

 In
 
 De-Gas, Inc. v. Midland Resources,
 
 470 So.2d 1218 (Ala.1985), the "Alabama Supreme Court addressed the effect of the failure to pay a filing fee at the time that a civil action was “filed” in the circuit court. In addressing the purpose and intent behind the adoption of § 12-19-70, Ala.Code 1975, the Alabama Supreme Court explained:
 

 “The use of the term ‘shall’ in this provision makes the payment of the filing fee mandatory.
 
 See Prince v. Hunter,
 
 388 So.2d 546, 547 (Ala.1980). It was the obvious intent of the legislature to require that either the payment of this fee or a court-approved verified statement of substantial hardship accompany the complaint
 
 at the time of filing.
 
 No doubt the purpose behind the passage of this provision was to discourage the filing of frivolous suits and to insure that the clerks of the circuit courts do not become ‘credit men.’
 
 Cf. Turkett v. United States,
 
 76 F.Supp. 769 (N.D.N.Y.
 
 *335
 
 1948) (holding that payment of the filing fee is a prerequisite to filing an action under Rule 3, Fed.R.Civ.P., which is identical to our Rule 3, and 28 U.S.C.A., § 549 (now 28 U.S.C.A., § 1914), which provides that the party instituting a civil action must pay a filing fee, and commenting, ‘Any other construction would open the door to actions without merit by irresponsible parties, and make the clerk a credit man, whose accountability might result in his personal loss,’ 76 F.Supp. at 770).
 

 “This Court has recognized that ‘a mere filing of a complaint is
 
 not commencement
 
 in all cases.’
 
 Ward v. Saben Appliance Co.,
 
 391 So.2d 1030, 1032 (Ala.1980). While ‘[t]he filing of a complaint is ... a significant factor in commencing actions and suspending the operation of applicable statutes of limitations; ... it is not the
 
 sole
 
 factor.’ (Emphasis added.)
 
 Id.
 
 We must decide whether, in light of the above-noted legislative change in the fee payment procedure, the prepayment of the filing fee is now a factor to be considered in determining whether a suit has been commenced, thereby avoiding the running of the statute of limitations. We hold that it is.
 

 [[Image here]]
 

 “By failing to pay at the time of filing the complaint the filing fee mandated by § 12-19-70, the plaintiffs not only caused service to be withheld but effectively precluded
 
 any
 
 action by the clerk’s office necessary to actually set the case in motion. We can only conclude that plaintiffs did not have a
 
 bona fide
 
 intent, at the time of filing, to proceed with this action. Consequently, this action was not ‘commenced’ at the time of filing and the statute of limitations continued to run so as to bar the action.”
 

 470 So.2d at 1220-22. The same is true for Rule 32 petitions. According to Rule 32.6(a), Ala. R.Crim. P., the circuit clerk shall file a Rule 32 petition only after a filing fee is paid or a request to proceed
 
 in forma pauperis
 
 is granted.
 

 In this case, the petition that counsel attempted to file on December 27, 1999, was not accompanied by a filing fee or a request to proceed
 
 in forma pauperis.
 
 Therefore, the petition was not properly filed at that time, as contemplated by Rule 32.6(a), Ala. R.Crim. P. Thereafter, on January 28, 2000, a Rule 32 petition and a request to proceed
 
 in forma pauperis
 
 were presented to the circuit clerk, and that was the date the circuit clerk used as the filing date for the Rule 32 petition. The circuit court did not grant the request to proceed
 
 in forma pauperis
 
 until February 2, 2000. Therefore, the circuit court should have used February 2, 2000, as the filing date. However, as the appellant concedes, any error regarding the filing date is not important in this case because the appellant timely filed his petition. Under these circumstances, the circuit court properly denied the appellant’s request to change the filing date to December 27, 1999.
 

 IV.
 

 The appellant argues that appellate counsel
 
 [9]
 
 William Mathews rendered ineffective assistance during post-trial proceedings because he allegedly did not conduct any investigation with regard to the claims he raised in the motion for a new trial and on appeal. Specifically, he contends that counsel did not obtain evidence that would have established his inability to
 
 *336
 
 waive his
 
 Miranda
 
 rights and mitigation evidence concerning his tumultuous childhood and his mental impairment. He further asserts that appellate counsel should have argued in the motion for a new trial that his trial attorneys rendered ineffective assistance by not presenting such evidence during the trial.
 

 During the evidentiary hearing, Mathews testified that he knew that the appellant had lived in Cleveland, but he did not have the finances to research his Cleveland background; that he could have telephoned and sent letters or asked for funds to investigate the appellant’s life in Cleveland, but he did not; that, based on what he knows now, he would have requested funds to hire an expert to investigate the appellant’s mental health; that, in hindsight, he should have raised several other issues; and that he was stressed, overworked, having marital problems, and was drinking some around the time he represented the appellant. However, he also testified that he had trial counsel’s entire case file, that he spent approximately 100 hours preparing for the hearing on the motion for a new trial, that he was ready to argue 32 issues before the trial court, that he examined over 2,000 pages of trial transcript, that he talked with the appellant, and that he met with the appellant’s Birmingham relatives three or four times. During the hearing, the following occurred:
 

 “[STATE:] All right. Mr. Mathews, how many issues did you initially raise or determine in your research and looking at this case. How many issues did you come up with?
 

 “[MATHEWS:] Over a hundred hours I spent creating that. I think I had about 30 or 32 issues, which I initially had maybe thirty-five and then on the first draft boiled it down to I believe twenty-eight. And then I think I presented either fifteen or sixteen interfacing and compiling of certain issues that were not necessarily redundant but could be argued together.”
 

 (R. 442.) Finally, Mathews was privy to several different expert opinions that the appellant was malingering about his mental condition.
 

 Our review of the record from the appellant’s trial reflects that, near the end of the guilt phase of the trial, the appellant was removed from the courtroom for his disruptive behavior and refused to return.
 
 [10]
 
 During the hearing on the appellant’s motion for a new trial, one of his trial attorneys, Mickey Johnson, testified that, after the jury returned a guilty verdict, he went to the jail, advised the appellant of the verdict, and advised him of his right to be present during the sentencing phase. The following also occurred during the hearing on the appellant’s motion for a new trial:
 

 “[DISTRICT ATTORNEY:] And do you recall Mr. Clemons’ response to those requests and that information that was made available to him?
 

 “[JOHNSON:] Again, not in exact terms. I think he said that Mr. Bass and I were not his lawyers, that he didn’t want to have any part to do with the proceeding or something to that effect.
 

 “[DISTRICT ATTORNEY:] He refused to come back to the courtroom?
 

 “[JOHNSON:] Yes, sir.
 

 “[DISTRICT ATTORNEY:] And he refused any efforts to call witnesses on his own behalf at that time?
 

 
 *337
 
 “[JOHNSON:] Yes.
 

 “[DISTRICT ATTORNEY:] Maybe not specifically, but in general, he refused to?
 

 “[JOHNSON:] He refused to take advantage of that right; yes.
 

 “[DISTRICT ATTORNEY:] And, now, after we carried on that conversation for some period of time, all parties left the jail; is that correct?
 

 “[JOHNSON:] Yes.
 

 “[DISTRICT ATTORNEY:] And we were going to proceed to the sentencing phase of the trial. What, if anything, did you do in regard to the Defendant’s family at that time?
 

 “[JOHNSON:] I followed the Defendant’s grandmothers home and talked with an aunt, but I don’t remember which aunt that I talked with. I advised them of what the verdict had been and advised them on what the upcoming proceedings would be about. I asked them to come down and testify. I advised them that we needed someone to speak on his behalf during the sentencing phase. I believe Mrs. Barron, who is his grandmother, I was informed was either at work or had to go to work, and, in essence, was told that as far as they were concerned the whole process was a mockery or something to that effect and they didn’t care to participate in it.
 

 “[DISTRICT ATTORNEY:] They refused to come?
 

 “[JOHNSON:] Yes.”
 

 (Motion for a new trial R. 27-29.) The appellant’s aunt also testified during the hearing and was uncooperative, as is clearly evidenced by her responses to the questions posed to her. Further, our examination of the record of the hearing shows that Mathews made very lengthy and well-reasoned arguments related to many claims.
 
 [11]
 
 Finally, our review of the direct appeal shows that Mathews raised 16 issues in his brief to this court
 
 [12]
 
 and that we addressed those issues in a lengthy opinion on direct appeal.
 

 In its order denying the petition, the circuit court found as follows:
 

 “[H]aving reviewed the record, the Court finds that Mathews rendered effective assistance of counsel. It seems to this Court that Defendant’s Rule 32 counsel is attacking Mathews for not presenting these issues as collateral counsel would have.
 

 
 *338
 
 “Notwithstanding Mathews’ admission of his shortcomings, the Court finds he rendered effective assistance to the Defendant. In
 
 Chandler [v. United States],
 
 [218 F.3d 1305 (11th Cir.2000) ] the Court specifically noted that ‘Because the standard is an objective one, that trial counsel (at a post-conviction evidentiary hearing) admits his performance was deficient matters little.’ See
 
 Tarver v. Hopper,
 
 169 F.3d 710, 716 (11th Cir.1999) (noting that ‘admissions of deficient performance are not significant’); see also
 
 Atkins v. Singletary,
 
 965 F.2d 952, 960 (11th Cir.l992)(‘[I]neffec-tiveness is a question which we must decide [so] admissions of deficient performance by attorneys are not decisive.’)
 

 “The sixth amendment does not require trial counsel present every reasonable defense, undertake every possible investigation until it bears fruit or dead ends, nor does it require trial counsel to present every available witness. Mathews agreed with collateral counsel that he felt he was not effective as he did not raise every reasonable claim. Mathews even began second guessing himself on a number of matters raised by collateral counsel regarding additional things he could have done such as have co-counsel appointed, requested extraordinary expenses, to do a complete investigation, hire an investigator, hire an investigator to go to Cleveland, Ohio, associate counsel in Ohio, etc. It appears to the Court that Mathews was not aware of the appropriate standard for determining deficient performance of an attorney. The request for funds for Mathews’ wish list would have been denied by this Court. Defendant had been evaluated on at least four other occasions, including one extensive in-patient evaluation, and the Court finds that there would not have been the need to hire an additional psychologist, much less the additional experts Mathews testified he would have wanted. Further, Defendant was found to be malingering. Defendant, having been convicted twice of this crime, desired not to be present or take part in his sentencing hearing. Mathews had very good knowledge of what transpired at the trial of this case and was prepared to fully argue Defendant’s cause at the Motion for New Trial. Mathews argued numerous issues for a new trial. He urged the Court to quash the indictment on the grounds that electrocution was cruel and unusual punishment and [the] prosecution of this case had constituted double jeopardy. Mathews also argued trial counsel rendered ineffective assistance for failing to put on alibi witnesses and failing to call certain witnesses in the penalty phase. Mathews also argued the change of venue matter. He also argued trial counsel was ineffective for not calling [an expert] as a witness and not having the prior carjackings excluded. Mathews argued the State failed to produce sufficient evidence to prove Defendant committed the murder. Mathews also argued on the issue of the removal of Defendant from the courtroom. He argued on the charging of jury suppression and Defendant’s confession. Mathews also filed an appeal on behalf of Defendant with the Alabama Court of Criminal Appeals containing a 47 page, 16 issue brief which the Court finds as illustrative of effective representation as Mathews focused on strong issues.
 

 “Mathews raised the issue of Johnson’s representation at the new trial hearing.... Any harm caused by Mathews’ handling of this issue in the Motion for New Tidal hearing is harmless. Nothing the Court has heard would have allowed Defendant a new trial.
 

 
 *339
 
 “For instance, when the
 
 Miranda
 
 issue was raised on Defendant’s Motion for New Trial, the Court was aware of Defendant’s malingering and is of the opinion funds for an additional psychologist to challenge Defendant’s competency to waive his constitutional rights would not have been granted.
 

 “Further, since Defendant did not establish ineffective assistance of counsel by Mathews on the facts of this case, he cannot use other ‘bad acts’ or improper evidence to show conformity therewith. A.R. Evid. 404(a). This evidence is irrelevant to the matter before the Court.”
 

 (C.R. 1150-53.)
 

 Also, with regard to the claim that counsel did not investigate and establish that the appellant did not have the ability to waive his
 
 Miranda
 
 rights, the circuit court found as follows:
 

 “Defendant says Dr. Rivenbark indicated that it was doubtful Defendant understood his
 
 Miranda
 
 rights. Two years after Dr. Rivenbark indicated this, Dr. Rivenbark said he believed Defendant was a malingerer and had been malingering all the time. Therefore, the Court dismisses Dr. Rivenbark’s initial report.
 

 “The Court also notes that in the federal trial, Defendant was found to have the capacity to understand his
 
 Miranda
 
 rights. Based on the federal proceedings, Defendant cannot show prejudice.
 
 Holladay v. Haley,
 
 209 F.3d 1243 at 1248.
 

 [[Image here]]
 

 “The Court finds trial counsel rendered effective assistance to Defendant in an investigation into Defendant’s ability to waive his constitutional rights.”
 

 (C.R. 1111.)
 

 Finally, the circuit court made extensive, thorough findings with regard to the claim that appellate counsel should have raised a claim that trial counsel did not conduct an adequate investigation into his background and his mental impairment. Those findings included, in part, the following:
 

 “Trial counsel’s investigation into mitigating evidence was hampered by Clemons’ family who were uncooperative and even hostile to trial counsel. Indeed, Clemons’ family’s meddlesome ways began before Johnson and Bass were appointed to represent Clemons. Bob Williams, Clemons’ first lawyer, was forced to file a motion to withdraw from the case by Clemons’ family. In the motion to withdraw that Williams filed he noted the following:
 

 “ ‘In addition, the Defendant relies on family members to act as surrogate decision-makers in this case. Without fail he affirms whatever they consider to be in his best interest.
 

 “ ‘These relatives have expressed their own specific and apparently unalterable agenda as to exactly how this case is to be prepared and tried, which is in direct conflict with the defense strategies developed by this Office.
 

 “ ‘[Consequently], they have become uncooperative and bellicose. Due to their controlling influence over the defendant, the attorney-client relationship and the preparation for this case has been substantially impeded.’
 

 [[Image here]]
 

 “Johnson faced the same obstacles that caused Williams to withdraw. During his investigation, Johnson discovered that certain members of Clemons’ family were combative and difficult. R32 Yol. 33 at 6463-64. The family members displayed a distrust of Johnson and at times would even insult him, and presumably, Roger Bass.
 
 Id.
 
 The family
 
 *340
 
 members that were contacted by trial counsel were Clemons’ aunts who lived in Birmingham and one who lived in Ohio along with Clemons’ mother and grandmother. R82 Vol. 6 at 1124-25. Anytime that Johnson brought up the necessity of preparing for the penalty phase, the aunts became very hostile because they would not accept that Clemons could be convicted. R32 Vol. 33 at 6466. Presumably because of his difficulties with the family members, Johnson was never able to develop a relationship of trust with Clemons. R32 Vol. 33 at 6338.
 

 “Based upon the investigation that he was able to conduct, Johnson developed a strategy of presenting evidence that Clemons had a difficult life and was law abiding until he fell in with the wrong crowd. R32 Vol. 33 at 6469-70. To that end, Johnson planned to present the testimony of Clemons’ grandmother — who he characterized as ‘a fine lady — to testify as to Clemons’ difficult upbringing and the effect it had on Clemons getting in with the wrong crowd. R32 Vol. 33 at 6469-70. As a part of this strategy to humanize Clemons, Johnson also wanted Clemons to apologize and admit his guilt and beg for mercy. R32 Vol. 33 at 6470.
 

 “These plans went out the window, however, when Clemons’ uncle, Michael Clemons, testified against Clemons during the guilt phase. Immediately before the uncle testified, Clemons jumped up and began yelling that he had already been convicted of this murder in federal court — a fact that had been kept from the jury by order of the Court. R. 1060-61. In addition, Clemons indicated that he desired to fire his trial counsel and that he did not want to attend the trial any further. Id. After Clemons’ outburst, Clemons’ family members quit attending the trial and their already hostile attitude became even more hostile. As Mr. Bass recounted to the Court during trial, one of Clemons’ aunts who he knew as ‘Betty,’ called him after Clemons’ outburst and made an implied threat against Bass and Johnson if they continued representing Clemons. R. 1259. After the conviction, Johnson made efforts to contact Clemons’ grandmother to come and testify at the penalty phase but Clemons’ aunts said the grandmother could not testify because she had to work. R32 Vol. 33 at 6475-76. In their misguided attempt to assist Clemons in obtaining a mistrial, Clemons’ family members prevented trial counsel from presenting mitigating evidence on Clemons’ behalf.
 

 “Trial counsel investigated Clemons’ mental health in an effort to present such evidence at the penalty phase. Johnson had available four different psychological evaluations that had been done before Clemons’ federal trial. The reports from all four evaluations noted that Clemons had malingered in an effort to feign mental illness.... Johnson recalls that he talked with Dr. Grant, a psychologist, who had performed an evaluation before Clemons’ federal trial. Johnson recalls talking to Dr. Grant about testifying and he recalls Dr. Grant stating that his testimony would not be helpful. R32 Vol. 33 at 6477-78. In addition, if he called Dr. Grant, the State on cross-examination could have inquired into Dr. Grant’s opinion that Clemons malingered during the evaluation. R32 Vol. 33 at 6480-81. None of the psychologists who evaluated Clemons recommended to Johnson that Clemons be evaluated by a neuropsychologist. R32 Vol. 33 at 6478, 6479-80. Faced with all of these prospects, trial counsel decided on the strategy to humanize Clemons.”
 

 (Remand C.R. 38-42.)
 

 “The additional ‘mitigating1 evidence presented by Clemons stands in stark
 
 *341
 
 contrast to evidence presented in
 
 Williams v. Taylor[,
 
 529 U.S. 362 (2000) ].... Clemons offered evidence in this remand hearing of two expert witnesses who were paid approximately $40,000 to offer dubious evidence that Clemons is ‘brain damaged.’
 

 “In addition, this case does not present the situation like the one in
 
 Wiggins v. Smith,
 
 539 U.S. 510, 123 S.Ct. 2527 (2003), especially when considering that trial counsel had a plan to present mitigating evidence that would humanize Clemons....
 

 “This case is not
 
 Wiggins
 
 or
 
 Williams.
 
 Even though trial counsel was hampered in his investigation by Clemons’ family, they settled upon a strategy of presenting evidence that Clemons had a difficult life and was law abiding until he fell in with the wrong crowd. To that end, trial counsel planned to present the testimony of Clemons’ grandmother to testify as to Clemons’ difficult upbringing and the effect it had on Clemons getting in with the -wrong crowd. As a part of this strategy to humanize Clemons, trial counsel also wanted Clemons to apologize and admit his guilt and beg for mercy. As previously stated, trial counsel did not present this testimony because Clemons and his family refused to come to court after they both caused an outburst in the courtroom. In addition, trial counsel investigated for mental health testimony by contacting one of the psychiatrists who had examined Clemons before the federal trial but were told the testimony would not be favorable. Furthermore, Clemons’ history of malingering on mental health evaluations would have been brought out if any mental health professional would have testified.
 

 “Clemons has not established by a reasonable probability that the balance of aggravating and mitigating circumstances did not warrant a death sentence.”
 

 (Remand C.R. 87-90.)
 

 “To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) that his counsel’s performance was deficient and (2) that he was prejudiced as a result of the deficient performance.
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 

 “ ‘The appellant must show that his counsel’s performance was unreasonable, considering all of the attendant circumstances.... “[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel’s challenged conduct on the facts of the particular case, viewed as of the time of counsel’s conduct.”
 
 Strickland,
 
 466 U.S. at 690, 104 S.Ct. at 2066.’
 

 “Duren v. State,
 
 590 So.2d 360, 362 (Ala.Cr.App.1990), aff'd 590 So.2d 369 (Ala.1991), cert. denied, [503] U.S. [974], 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).
 

 “When this court is reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel’s conduct was appropriate and reasonable.
 
 Luke v. State,
 
 484 So.2d 531, 534 (Ala.Cr.App.1985). The burden is on the appellant to show that his counsel’s conduct was deficient.
 
 Luke.
 

 “ ‘Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair as
 
 *342
 
 sessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel’s perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action “might be considered sound trial strategy.” There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.’
 

 “Strickland,
 
 466 U.S. at 689, 104 S.Ct. at 2065-66. (Citations omitted.)
 
 Ex parte Lawley,
 
 512 So.2d 1370, 1372 ([Ala.] 1987).
 

 “Initially we must determine whether counsel’s performance was deficient. We must evaluate whether the action or inaction of counsel of which the petitioner complains was a strategic choice. ‘Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable.... ’
 
 Lawley,
 
 512 So.2d at 1372. This court must avoid using ‘hindsight’ to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel’s actions before determining whether counsel rendered ineffective assistance.
 
 Falkner v. State,
 
 586 So.2d 39 (Ala.Cr.App.1991).”
 

 Hallford v. State,
 
 629 So.2d 6, 8-9 (Ala.Crim.App.1992).
 

 “In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the
 
 Strickland v. Washington
 
 test if the defendant makes an insufficient showing on one of the prongs.
 
 Id.
 
 at 697, 104 S.Ct. at 2069. In fact, the Court explained that ‘[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.’
 
 Id.
 
 We defer to this guidance and address the ‘prejudice’ prong, for ‘[w]ith respect to the prejudice component, the lack of merit of [Thomas’s] claim is even more stark.’
 
 Id.
 
 at 699, 104 S.Ct. at 2070.”
 

 Thomas v. State,
 
 511 So.2d 248, 255 (Ala.Crim.App.1987) (footnote omitted).
 

 “Furthermore, to render effective assistance, an attorney is not required to raise every conceivable constitutional claim available at trial and on appeal.
 
 Holladay v. State,
 
 629 So.2d 673 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994);
 
 McCoy v. Lynaugh,
 
 874 F.2d 954, 965-66 (5th Cir.1989). Rather, counsel must be given some discretion in determining which claims possibly have merit, and thus a better chance of success, and which claims do not have merit, and thus have little chance of success.
 
 Heath v. State,
 
 536 So.2d 142 (Ala.Cr.App.1988);
 
 Smith v. Murray,
 
 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986);
 
 Engle v. Isaac,
 
 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).”
 

 Davis v. State,
 
 720 So.2d 1006, 1014 (Ala.Crim.App.1998).
 

 “ ‘[Experienced advocates have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues. Selecting the most promising issues for review has assumed a greater importance in an era when the time for
 
 *343
 
 oral argument is strictly limited in most courts and when page limits on briefs are widely imposed.’
 

 “Jones v. Barnes,
 
 463 U.S. 745, 746, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).”
 

 Boyd v. State,
 
 746 So.2d 364, 403 (Ala.Crim.App.1999). Also,
 

 “where the crimes committed seem to be aberrations from otherwise lawful behavior, the Eleventh Circuit has recognized that mitigating evidence of good character and the uncharacteristic nature of the crime may have more impact than in other cases.
 
 Collier [v. Turpin],
 
 177 F.3d [1184,] 1203 [(11th Cir.1999)];
 
 accord Harris v. Dugger,
 
 874 F.2d 756, 763-64 (11th Cir.1989).”
 

 McNair v. Campbell,
 
 307 F.Supp.2d 1277, 1318 (M.D.Ala.2004).
 

 “The purpose of ineffectiveness review is not to grade counsel’s performance.
 
 See Strickland,
 
 104 S.Ct. at 2065;
 
 see also White v. Singletary,
 
 972 F.2d 1218, 1221 (11th Cir.1992) (‘We are not interested in grading lawyers’ performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.’). We recognize that ‘[representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.’
 
 Strickland,
 
 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or ‘what is prudent or appropriate, but only what is constitutionally compelled.’
 
 Burger v. Kemp,
 
 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).
 

 [[Image here]]
 

 “...
 
 Because the reasonableness of counsel’s acts (including what investigations are reasonable) depends ‘critically’ upon ‘information supplied by the [petitioner]’ or ‘the [petitioner’s own statements or actions, ’ evidence of a petitioner’s statements and acts in dealing with counsel is highly relevant to ineffective assistance claims. Strickland,
 
 104 S.Ct. at 2066. ‘[An] inquiry into counsel’s conversations with the [petitioner] may be critical to a proper assessment of counsel’s investigation decisions, just as it may be critical to a proper assessment of counsel’s other litigation decisions.’
 
 Id.
 
 (‘[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable.’).”
 

 Chandler v. United States,
 
 218 F.3d 1305, 1313-19 (11th Cir.2000) (footnotes omitted) (emphasis added). Finally, when ineffee-tive-assistance-of-counsel claims involve the penalty phase of a capital murder trial, the focus is on “ ‘whether “the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” ’
 
 Stevens v. Zant,
 
 968 F.2d 1076, 1081 (11th Cir.1992), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993), quoted in
 
 Daniels [v. State],
 
 650 So.2d [544,] 568 [(Ala.Crim.App.1994)].”
 
 Jones v. State,
 
 753 So.2d 1174, 1197 (Ala.Crim.App.1999).
 
 See also Williams v. State,
 
 783 So.2d 108 (Ala.Crim.App.2000).
 

 The record supports the circuit court’s findings, and we adopt them as part of this opinion. After examining the record of the hearing on the motion for a new trial, counsel’s brief to this court, the record on direct appeal in this case, and
 
 *344
 
 the Rule 32 proceedings in this case, it is clear that Mathews did investigate and prepare for the motion for a new trial and the appeal. We also do not find any indication that Mathews’ personal problems affected his performance with regard to the motion for a new trial or the direct appeal.
 
 [13]
 
 We further find that trial counsel’s performance with regard to the appellant’s ability to waive his
 
 Miranda
 
 rights was reasonable and that there was not any basis for an objection by appellate counsel to trial counsel’s performance. Finally, we find that, in light of trial counsel’s planned mitigation strategy and the appellant’s and his family’s actions that thwarted that strategy, as well as the findings set forth in Part I regarding the appellant's alleged mental retardation, there was not any basis for an objection by appellate counsel to trial counsel’s mitigation strategy. For all of the reasons set forth herein, we conclude that the appellant has not satisfied his burden under
 
 Strickland
 
 of showing that appellate counsel’s performance was deficient and that he was prejudiced by that performance. Therefore, he is not entitled to relief in this regard.
 

 V.
 

 The appellant next argues that the State did not comply with its discovery obligations under
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, he contends that the State did not disclose evidence about the criminal record of his uncle, Michael Clemons, and impeachment evidence concerning Leon Johnson. Initially, we note that the circuit court ordered that the district attorneys for Jefferson and Shelby County reveal any agreements, leniency, or understanding they had with Leon Johnson in exchange for his testimony against the appellant. Also, in its order denying the petition, the circuit court found as follows:
 

 “As to prosecution witness Michael Clemons, Defendant presented no testimony from Michael Clemons as to Defendant’s allegation that Michael Clemons was led to believe he would be imprisoned for not testifying against Defendant....
 

 [[Image here]]
 

 “Finally, ... Defendant says that there was a deal between prosecution witness Leon Johnson and the State of Alabama. The Court finds that no agreement ever existed. Randy Hill-man, Assistant District Attorney with the Shelby County District Attorney’s Office, signed an affidavit denying that there was any such agreement. In addition, Leon Johnson was convicted after a jury trial, not as a result of any plea agreement with the State. Notwithstanding that Leon Johnson was found guilty and the sentencing authority considered Leon Johnson’s testifying at Defendant’s trial, there was no agreement between Leon Johnson and the State and no prejudice.”
 

 (C.R. 1109-10.) The circuit court further found:
 

 “Defendant said that the State failed to disclose a ‘deal’ made between the State of Alabama and State’s witness Leon Johnson. As noted previously
 
 *345
 
 herein, Defendant did not establish any such deal was made.
 

 [[Image here]]
 

 “Defendant contended that Michael Clemons testified in hopes of a reward or because he believed the State of Alabama would encourage Ohio law enforcement officials ‘to imprison him on welfare charges.’ Defendant failed to establish this. Defendant did not call Michael Clemons....
 

 [[Image here]]
 

 “Because the factual averments within this claim were not supported by evidence introduced at the evidentiary hearing, this claim has been abandoned by Defendant. As to the issue concerning Michael Clemons’ criminal record, the Court finds this issue is not related to a valid claim in the petition.”
 

 (C.R. 1154-55.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. The appellant has made bare, speculative allegations as to these claims, but he has not supported them with facts or evidence. Therefore, he has not satisfied his burden of pleading and proof pursuant to Rules 32.3 and 32.6(b), Ala. R.Crim. P.
 

 The appellant also argues that the circuit court erred in denying his request for a privilege log of documents the State withheld from discovery during the Rule 32 proceedings. The record shows that the State submitted documents that it considered to be work product from the Shelby County District Attorney’s Office to the circuit court for an
 
 in camera
 
 inspection. During a motion hearing, the State objected to being required to assemble a privilege log, explaining that such a log would simply indicate that the documents consisted of trial notes and research. Thereafter, the circuit court examined the records
 
 in camera,
 
 found that the appellant was not entitled to any additional documents because they were privileged, and concluded that the appellant was not entitled to a privilege log. The record does not indicate that the circuit court’s actions were erroneous. Therefore, the appellant is not entitled to relief in this regard.
 

 VI.
 

 The appellant argues that his trial counsel labored under a conflict of interest because Johnson was employed by the district attorney’s office when the indictment was returned in this case; that we should presume prejudice and find that he was denied the effective assistance of trial counsel; that the conflict is imputed to Bass because he allegedly practiced with Johnson; and that the trial court should have known about the possible conflict and inquired further about it. The Alabama Supreme Court addressed a similar situation in
 
 Ex parte Borden,
 
 769 So.2d 950, 958-59 (Ala.2000), as follows:
 

 “Borden contends that one of his attorneys at trial had a conflict of interest, specifically, that the attorney, while involved in this case as defense attorney, had a continuing relationship with the Morgan County district attorney’s office, as a special prosecutor. Borden contends that the attorney, through his work as a special prosecutor in Morgan County, had a relationship with state law-enforcement agencies, because, Borden argues, the attorney depended on their investigative skills in order to prosecute his own Morgan County criminal cases. Borden argues that his attorney’s double judicial role — as a defense attorney in Lawrence County and a special prosecutor in Morgan County — creates a conflict of interest. This conflict, Borden argues, requires that he be given a new trial.
 

 “ ‘It is “a basic constitutional precept” that those prosecuted for
 
 *346
 
 criminal offenses have a right to the assistance of counsel during the proceedings.
 
 Pinkerton v. State,
 
 395 So.2d 1080, 1085 (Ala.Crim.App. 1980), cert. denied, 395 So.2d 1090 (Ala.1981). “Where a constitutional right to counsel exists, [the United States Supreme Court’s] Sixth .Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest.”
 
 Wood v. Georgia,
 
 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981). “[T]he importance of ensuring that defense counsel is not subject to any conflict of interest which might dilute loyalty to the accused has been long and consistently recognized.”
 
 Douglas v. United States,
 
 488 A.2d 121, 136 (D.C.1985). More than 45 years ago, the United States Supreme Court declared: “The right to counsel guaranteed by the Constitution contemplates the services of an attorney
 
 devoted solely to the interests of his client.” Von Moltke v. Gillies,
 
 332 U.S. 708, 725, 68 S.Ct. 316, 324, 92 L.Ed. 309 (1948)(emphasis added [in Molton]). The right to conflict-free counsel applies whether counsel is appointed or retained. See
 
 Cuyler v. Sullivan,
 
 446 U.S. 335, 343-45, 100 S.Ct. 1708, 1715-16, 64 L.Ed.2d 333 (1980).’
 

 “Molton v. State,
 
 651 So.2d 663, 668 (Ala.Crim.App.), on return to remand, 651 So.2d 672 (Ala.Crim.App.1994).
 

 “The State argues that, to entitle a defendant such [as] Borden to a reversal of Borden’s conviction, the conflict of interest alleged must be a true conflict, not a speculative or hypothetical one. ‘ “In order to demonstrate a violation of his Sixth TUnendment rights, a defendant must show that an actual conflict of interest adversely affected his lawyer’s performance.”
 
 Cuyler v. Sullivan,
 
 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980).’
 
 Dallas v. State,
 
 711 So.2d 1101, 1111 (Ala.Crim.App.1997), aff'd, 711 So.2d 1114 (Ala.1998). The State argues that the simple fact that Borden alleges a conflict of interest does not mean that a conflict of interest truly existed. The State argues that this claim, even when considered under the standard imposed by the ‘plain-error’ doctrine (see Rule 39(k), .Ala. R.App. P.), does not entitle Borden to a reversal. We agree with the State’s argument.”
 

 In its order denying the petition, the circuit court found as follows:
 

 “Mickey Johnson, who represented Defendant at trial, assisted the Shelby County District Attorney’s office for a brief period of time several months prior to his appointment in this cause. Johnson screened warrants and handled an unrelated juvenile matter. No evidence indicated that Johnson was involved in any way with Defendant’s case during such time. Defendant did not demonstrate that this Court was even aware of the underlying facts. As this Court was unaware of such arrangement, there can be no error. .Also, Defendant failed to establish that had the Court investigated, a conflict of interest would have shown. Based on the evidence presented, the Court finds no conflict of interest.
 

 “There has not been a showing by Defendant that Rule 1.11 which governs successive government and private employment and accompanying conflicts of interest were violated. Further, it appears any violation would be to the disadvantage of the State and not to the Defendant.
 

 
 *347
 
 “It is also noted again by this Court that Johnson and Bass were not associated in a.common firm. Thus, had there been a conflict by Johnson, this would not have affected Bass. This,' too, prevents a finding of error.
 

 “This claim is also denied.”
 

 (C.R. 1155-56.) The record supports the circuit court’s findings, and we adopt them as part of this opinion. Therefore, the appellant is not entitled to relief in this regard.
 

 VII.
 

 The appellant’s seventh argument is that his conviction and sentence are unconstitutional pursuant to
 
 Ring v. Arizona,
 
 586 U.S. 584, 122 S.Ct. 2428, 158 L.Ed.2d 556 (2002). However, the decision in
 
 Ring
 
 does not apply retroactively to cases pending on collateral review.
 
 See Schriro v. Summerlin,
 
 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004);
 
 McWilliams v. State,
 
 897 So.2d 437 (Ala.Crim.App.2004);
 
 Boyd v. State,
 
 913 So.2d 1113 (Ala.Crim.App.2003). Therefore, the appellant’s argument is without merit.
 

 VIII.
 

 Finally, the appellant argues that the circuit court erred in summarily denying relief on the following claims:
 

 1) the trial court did not conduct a hearing to determine his competency to stand trial;
 

 2) the trial court erred in excluding him from his trial;
 

 3) the trial court erred in allowing him to waive his right to be present at his trial;
 

 4) the trial court erred in not advising him of his right to self-representation;
 

 5) the trial court erred in forcing counsel on him;
 

 6) his successive federal and state trials violate double jeopardy principles;
 

 7) the trial court erred in denying his request for treatment as a youthful offender;
 

 8) the trial court erred in admitting his confession;
 

 9) the trial court erred in admitting evidence about prior bad acts and bad character;
 

 10) the trial court erred in allowing the in-court identification of him from a custodial photograph;
 

 11) the trial court did not properly handle, during the trial proceedings, situations that allegedly showed that the jury was tainted by
 
 ex parte
 
 contacts and influences;
 

 12) the trial court’s jury instructions were erroneous;
 

 13) the trial court unlawfully limited the jury’s consideration of mitigating circumstances;
 

 14) pretrial publicity made it impossible for him to receive a fair trial in Shelby County;
 

 15) the elimination of all jurors who were opposed to the death penalty denied him a fair trial;
 

 16) the trial court erred by not striking for cause jurors who stated that they would vote for the death penalty;
 

 17) prosecutorial misconduct denied him a fair trial;
 

 18) electrocution constitutes cruel and unusual punishment;
 

 19) the death penalty in Alabama is unconstitutional because it is used disproportionately against blacks; and
 

 20) the evidence was not sufficient to support his conviction and sentence.
 
 [14]
 

 
 *348
 
 Initially, we note that the appellant lists these claims as “Other Errors” in his brief. However, he does not present any argument in support of his contention, as required by Rule 28(a)(10), Ala. R.App. P. Therefore, his argument regarding these claims is not properly before this court.
 

 Moreover, these claims are nonju-risdictional claims that are precluded pursuant to the provisions of Rule 32.2(a), Ala. R.Crim. P. Also, because § 15-18-82(a), Ala.Code 1975, which became effective on July 1, 2002, modified Alabama law to provide for execution by lethal injection unless the person elects to be executed by electrocution, the appellant’s argument about execution by electrocution is moot. Therefore, the appellant is not entitled to relief on any of these claims.
 

 For the above-stated reasons, we affirm the circuit court’s judgment.
 

 AFFIRMED.
 

 McMILLAN, p.j., and COBB, SHAW, and WISE, JJ., concur.
 

 [1]
 

 . The appellant was originally convicted in federal court for murdering Douglas Althouse, a special agent for the United States Drug Enforcement Administration, and the court sentenced him to imprisonment for life without the possibility of parole. His conviction and sentence were affirmed.
 
 See United States v. Clemons,
 
 32 F.3d 1504 (11th Cir. 1994). He was then tried in state court for killing Althouse. At the time of his state trial, he had already been convicted in federal court for Althouse’s murder, and the main issue was whether he would be sentenced to death. The defense did not call any witnesses to testify during the penalty phase of the state trial.
 

 [2]
 

 . There is a dispute as to the date the appellant filed his petition. However, for our purposes, using either date, he timely filed his petition. Therefore, we need not address the dispute concerning the filing date at this time.
 

 [3]
 

 . In his brief to this court, the appellant raises other arguments. However, for the reasons set forth herein, we pretermit discussion of the remaining arguments at this time.
 

 [4]
 

 . This conclusion is consistent with established caselaw that holds that an illegal or void sentence may be challenged at any time.
 
 See Hunt
 
 v.
 
 State,
 
 659 So.2d 998, 999 (Ala.
 
 *320
 
 Crim.App.1994) (holding that "[m]atters concerning unauthorized sentences are jurisdictional and, therefore, can be reviewed even if they have not been preserved”).
 

 [5]
 

 . The public defender further testified, "Also we were going to raise questions about mental capacity. And mental capacity I was going to bring out much of the information that I believe was in your Exhibit 34. The fifth and sixth grade evaluation, the low IQ, the slow thinking. We had witnesses....” (R. 513.) In fact, he filed a lengthy pretrial "Motion for Complete In-Patient Psychiatric Examination and Evaluation” in which he stated:
 

 "Counsel has reason to believe that said Defendant may lack sufficient present ability to assist in the defense of this matter and cannot consult with said counsel with a reasonable degree of rational understanding of the facts and legal proceeding herein not only in preparation for and at the trial of this matter, but in preparation for and at any capital sentencing hearing resulting therefrom.
 

 "... Counsel has reason to believe that due to a severe mental disease or defect said Defendant may not be, nor have been able to understand and appreciate the nature of his constitutional rights afforded under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the
 
 United States Constitution,
 
 Article I, Sections 5, 6, 7, 9, 11, and 15, in the
 
 Constitution of Alabama of 1901,
 
 and all other applicable Alabama constitutional, statutory, procedural, and case law or to knowingly and voluntarily waive the same.
 

 "... Counsel has reason to believe that due to a severe mental disease or defect said Defendant, at the time of the alleged offense, may not have been able to understand and/or appreciate the nature and quality or wrongfulness of the alleged acts. "... The basis for these beliefs is as follows:
 

 "(a) Counsel understands that the Defendant has on a prior occasion been examined by the Alabama Department of Mental Health and Mental Retardation with questionable results as to his mental competence.
 

 "(b) Counsel and Co-counsel have attempted to have several conversations with the Defendant including those concerning basic legal procedures such as those involved with a seventy-two (72) hour hearing and an application for treatment as a Youthful Offender. Said counsels were unable to determine whether or not the Defendant even began to independently understand such procedures.
 

 "(c) Counsel has had conversationfs] with members of the Defendant’s family and with other counsel who previously represented said Defendant, all of whom indicate that the Defendant could have a history of suffering from a mental disease or defect.
 

 "(d) Counsel understands that since the Defendant has been incarcerated in this matter, officials at the Shelby County Jail have contacted Chilton-Shelby Mental Health Center to treat the Defendant’s psychiatric condition. Counsel further understands that at the request of said officials, Dr. Anthony Owens, with said center, has done a preliminary evaluation of the Defendant which would indicate that the Defendant shows certain psychotic tendencies, perhaps consistent with a psychotic history, which could be of an emergency nature.”
 

 (C.R. 5696-97.) The trial court granted the motion and stayed the proceedings pending the completion of the mental health evaluation. However, the public defender was al
 
 *321
 
 lowed to withdraw, new counsel was appointed, and newly appointed counsel withdrew the motion for a mental evaluation. The reason for the withdrawal of the motion is not apparent from the record.
 

 [6]
 

 .
 
 Other evidence also showed that the appellant had psychological disturbances and a low functioning intellect, that he did not do well in school, and that he had difficulty performing when he worked.
 

 [7]
 

 . In
 
 Perkins,
 
 while urging the Legislature to develop procedures to implement the holding in
 
 Atkins,
 
 the Alabama Supreme Court stated:
 

 "Although the Legislature has not had an occasion to address this State’s policy on this matter and establish a procedure for determining whether a capital defendant is mentally retarded and therefore not subject to the death penalty, we conclude that Perkins does not suffer from mental retardation under the definitions considered by the United States Supreme Court in reaching its holding in
 
 Atkins
 
 or as defined by any of the state statutes that prohibit the imposition of the death sentence on a mentally retarded defendant.
 

 "... Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached age 18).”
 

 851 So.2d at 456 (footnotes omitted). Currently, the only Alabama statute on the subject is § 15-24-2(3), Ala.Code 1975, which defines a "mentally retarded person" as "[a] person with significant subaverage general intellectual functioning resulting in or associated with concurrent impairments in adaptive behavior and manifested during the developmental period, as measured by appropriate standardized testing instruments.”
 

 [8]
 

 . In this regard, we direct the circuit court’s attention to the United States Supreme Court’s decisions in
 
 Wiggins v. Smith,
 
 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and
 
 Williams v. Taylor,
 
 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).
 

 [1]
 

 . The examiners noted the appellant’s lack of participation in the testing and concluded:
 

 ”[T]he present psychological testing of Mr. Clemons’ intellectual ability must be considered invalid. It seems clear that Mr. Clemons did not provide a sincere effort and very likely purposely presented an appearance of impaired ability. Based on previous results, educational history, and impressions from his relatives, Mr. Clemons is probably functioning in the borderline range of intellectual ability. It is unlikely that he falls in the range of mild mental retardation. Regardless of his formal IQ level, his social, educational, and occupational functioning do not suggest significant intellectual impairment.”
 

 (C.R. 1324.) The examiners further noted:
 

 “The diagnosis of malingering was made to describe a pattern of voluntary behavior and it is not considered to be a mental disorder. The evidence that Mr. Clemons was malingering mental disorders was quite detailed and can be divided in two areas: a) malingering of psychotic symptoms (e.g., hallucinations of little green men); and b) malingering of cognitive deficits. The psychotic symptoms that Mr. Clemons described are very implausible. Clearly defined visual hallucinations are quite rare. In addition, people who experience genuine hallucinations report that they are not constant experiences and that distractions, such as singing or exercise, will temporarily make the hallucinations decrease or disappear entirely. Mr. Clemons denied this. Mr. Clemons’ own discussions about his symptoms were inconsistent. For example, telling one staff member everyone should be able to see what he claimed and telling someone else the next day that nobody else could see them. In addition, people with genuine psychotic disorders often neglect their personal hygiene, but Mr. Clemons was consistently careful to maintain his hygiene and personal appearance.
 

 
 *325
 
 Finally, there was no evidence of disordered thought processes such as tangentiality, circumstantiality, loose associations, thought blocking, or disorganization. Such disrupted thinking processes are nearly universally present among people who suffer genuine hallucinations to the degree Mr. Clemons reports. In sum, there are numerous inconsistencies with Mr. Clemons' reports and what is known about people who suffer genuine psychotic thought disorders.”
 

 (C.R. 1325.)
 

 [2]
 

 . While he was awaiting trial in Alabama, the appellant was evaluated at Taylor Hardin Secure Medical Facility in July 1994. One examiner, who was not able to complete all of the tests because the appellant was not cooperative, made the following observation:
 

 “Based upon the information available to me, it is my opinion that Mr. Clemons’ silence and lack of cooperation were deliberate and conscious decisions and were not due to any significant mental disease or defect. Furthermore, given the information gathered by other examiners since my initial evaluation I am more convinced than ever that he has been deliberately malingering concerning his intellectual ability and his mental state.
 

 [[Image here]]
 

 "... Mr. Clemons' intelligence probably falls somewhere in the mid 70's to mid 80’s, which is within the Borderline to Low Average range of intelligence."
 

 (C.R. 1309-10.)
 

 [3]
 

 . With regard to the disparity in the appellant’s test scores from 2001 and 2004, the following occurred:
 

 "[STATE:] Is it possible that Mr. Clemons' full scale IQ would drop seventeen points from seventy-seven to sixty in about three years?
 

 "[KING:] Not ordinarily without some kind of intervening event, like stroke or serious disease or development of some physical problem that might account for that.
 

 "[STATE:] Are you aware of any such?
 

 "[KING:] I am not.
 

 "[STATE:] So what is your interpretation of his scores on the WAIS?
 

 "[KING:] That he was dissembling; in other words, that he was not providing his best effort on many of the subtests.
 

 "[STATE:] Do certain portions of the WAIS and the WAIS-III contain — such as the vocabulary and similarities sections, contain some of the same questions?
 

 "[KING:] Yes, they do. Some things overlap.
 

 "[STATE:] Were there any questions that he got wrong in 2004 on the WAIS that he actually got right in 2001 on the WAIS-III?
 

 "[KING:] For example, on the vocabulary items when asked to define winter, in 2001 he gave a two-point response saying it was the cold time of the year. And in 2004 he said it was fall, which would be a zero response.
 

 "In 2001 when asked the question on comprehension, ‘what should you do if you find an envelope in the street that is sealed and addressed and has a new ‘stamp’? In
 
 *327
 
 2001 he indicated 'put it in a mailbox’ and in 2004 he said 'look at it’?
 

 [[Image here]]
 

 “[STATE:] Could you please tell us, Doctor, what those differing answers might indicate to you?
 

 "[KING:] In my experience, they indicate to me clearly the presence for malingering, giving false answers in a purposeful fashion.
 

 (Remand R. 793-96.)
 

 [4]
 

 . King also administered the Test of Memory Malingering ("TOMM”). The scores indicated that the appellant was malingering for memory difficulties and appeared to give incorrect responses to every third item on the test. (Remand R. 789.)
 

 [5]
 

 . Another expert who was retained by the appellant’s attorneys, Dr. Joseph Chong-Sang Wu, an associate professor at the University of California Irvine College of Medicine and clinical director of the University of California Irvine-Brain Imaging Center, testified that he came to Alabama to perform a Positron Emission Tomograph ("PET”) scan on the appellant. Based on the results, he concluded that the appellant had brain damage.
 

 Dr. Helen Mayberg, a neurologist who was retained by the State, testified that the PET scan was not considered reliable for the purpose for which it was used by Dr. Wu. She further testified that her review of the PET scan findings showed that the appellant had normal brain activity and did not have a brain injury.
 

 The appellant attempted to use the PET scan results to show that he had suffered from a brain injury at or near birth. The appellant was bom in 1971, and the test was conducted in 2004. Also, Wu conceded that none of the scientific journals or studies supported the use of a PET scan as a diagnostic tool to ascertain old brain injuries. The appellant could not show that the PET scan was reliable and generally accepted in the scientific community to diagnose 30-year-old brain injuries. Therefore, the circuit court properly found that the PET scan results were not admissible because they did not satisfy the
 
 Frye v. United States,
 
 293 F. 1013 (D.C.Cir.1923), test.
 

 [6]
 

 . The appellant argues that he was entitled to have a jury empaneled to determine whether he was mentally retarded. However, he did not first present this argument to the circuit court. Therefore, it is not properly before this court.
 
 See Pate v. State,
 
 601 So.2d 210 (Ala.Crim.App.1992).
 

 [7]
 

 . The appellant admits that this issue is not important in this state proceeding, but contends that it is crucial to future federal habeas corpus proceedings.
 

 [8]
 

 . Effective August 1, 2002, Rule 32.6(a), Ala. R.Crim. P., was amended to provide, in pertinent part:
 

 “If the application to proceed in forma pau-peris is granted, the filing fee shall be waived. If, upon final disposition of the petition, the court finds that all of the claims for relief are precluded for any of the reasons stated in Rule 32.2, it may assess the filing fee, or any portion thereof, and order the correctional institution having custody of the petitioner to withhold 50% of all moneys the institution then has on deposit for the petitioner, or receives in the future for the petitioner, until the filing fee that has been assessed by the court has been collected and paid in full. The order shall also direct the institution to forward to the clerk of the court in which the petition was filed, at least once every three months until that portion of the filing fee assessed by the court is paid in full, any such moneys collected from the petitioner.”
 

 [9]
 

 . As noted in Part II of this opinion, new counsel was appointed to represent the appellant during the motion for a new trial proceedings and on direct appeal.
 

 [10]
 

 . This Court may take judicial notice of our records.
 
 See Ex parte Salter,
 
 520 So.2d 213 (Ala.Crim.App.1987).
 

 [11]
 

 . Mathews also argued that the record did not include the suppression hearing, and he was given more time until the suppression record could be completed to present issues related to that claim.
 

 [12]
 

 . Mathews made the following arguments on direct appeal to this court: double jeopardy principles barred prosecution and conviction in both state and federal court for the same offense, the indictment should have been dismissed because capital punishment is unconstitutional, the trial court abused its discretion in denying the appellant’s application for treatment as a youthful offender, the appellant was denied his constitutional right to a fair trial because his family members were excluded from the courtroom, the trial court erred in denying the motion to exclude the jury venire because of the allegedly unconstitutional jury venire selection process, the prosecutor violated
 
 Batson,
 
 the trial court erred by removing the appellant from the courtroom, the trial court erred in denying the motion for a change of venue, the trial court erred in denying the motion to suppress the appellant’s statements to law enforcement, the trial court should have excluded evidence about collateral bad acts, the trial court erred in not granting a mistrial after the sequestered jurors were disrupted, the trial court erred in denying the motion for a judgment of acquittal, the appellant’s trial counsel rendered ineffective assistance, and the trial court erred in recharging the jury on certain instructions without the appellant being present.
 

 [13]
 

 . The appellant emphasizes the fact that, after Mathews represented him, he was disciplined by the Alabama State Bar. However, "[t]he fact that [attorneys] have been disciplined by the Alabama State Bar on unrelated matters has no bearing on their performance in [this] trial. [The defendant] was still obliged to satisfy the
 
 Strickland
 
 test. See
 
 People v. Allen,
 
 [220 Ill.App.3d 772, 580 N.E.2d 1291, 162 Ill.Dec. 872 (1991)].”
 
 Adkins v. State,
 
 930 So.2d 524, 549 (Ala.Crim.App.2001) (opinion on return to third remand).
 

 [14]
 

 . The appellant raised additional claims in his petition, but he does not pursue them on
 
 *348
 
 appeal. Therefore, we deem those claims abandoned.
 
 See Brownlee v. State,
 
 666 So.2d 91 (Ala.Crim.App.1995).